UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

UNITED STATES OF AMERICA,

        Plaintiff,

   v.

PETE AGAPITO CHAVEZ,

        Defendant.

_____/

NO. 2:09-cr-0033 FCD

MEMORANDUM AND ORDER

----oo0oo----

    This matter is before the court on defendant Pete Agapito Chavez's ("Chavez" or "defendant") motion to suppress evidence seized by law enforcement officers during the search of his car on December 11, 2008.  Defendant is charged in the indictment with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  (Indictment [Docket #6], filed Jan. 22, 2009).  The court held an evidentiary hearing on October 2, 2009.  Thereafter, the court requested supplemental briefing.  Having reviewed the file herein and heard the testimony of witnesses and arguments of counsel, the court GRANTS defendant's motion to suppress.

1                          **BACKGROUND**[1]

2        On December 10, 2009, detective Anthony Desimone

3   ("Desimone") of the Stockton Police Department began conducting

4   an investigation into a carjacking, which had occurred at

5   approximately 7:15 p.m. that evening.  (Tr. at 2-3.)  Two suspect

6   vehicles were involved in the carjacking of a UPS truck, one

7   white station wagon with wood paneling and one dark-colored four

8   door vehicle.  (Tr. at 3, 26.)  With respect to the dark-colored

9   vehicle, there were conflicting descriptions; however, at least

10  one of the three suspects taken into custody that night

11  identified the car as purple-colored sedan belonging to a person

12  named Darnell Brooks ("Brooks").  (Tr. at 4-5, 33.)  Desimone

13  located booking photos of Brooks prior to the search of

14  defendant's car.  (Tr. at 34.)

15       That same night, at approximately 8:30 p.m., there was a

16  home invasion robbery.  Witnesses claimed that eight black males

17  armed with guns committed the robbery.  (Tr. at 6.)  Desimone had

18  the suspects from the carjacking stand in a lineup; the victims

19  from the home invasion robbery identified the carjacking suspects

20  as involved in the home invasion robbery.  (Tr. at 65.)  At the

21  hearing, defendant Chavez was identified by Desimone as appearing

22  to be of mixed Mexican and African-American descent.  (Tr. at

23  66.)  In the police report filed in December 2008, Officer Lopez

24  described Chavez as a male of Hispanic origin.  (Tr. at 128.)

25  /////

26  _____

27       [1]    The facts are taken from the testimony and evidence
    received at the evidentiary hearing held on October 2, 2009.
28  (Rep.'s Tr. of Evidentiary Hr'g on Def.'s Mot. to Suppress
    ("Tr.")).

                                  2

1       One of the victims of the home invasion robbery notified

2   Desimone that she heard from someone in her apartment complex

3   that the suspects lived in one of three different apartments in

4   the area.  (Tr. at 6.)  Desimone asked three other detectives,

5   Nance, Jose Lopez ("Lopez"), and Jose Martinez ("Martinez"), to

6   accompany him to check the three apartments and verify if the

7   information provided was true, identify any persons living in the

8   apartments, and locate stolen property from the home invasion

9   robbery.  (Tr. at 7.)  Nobody was at the first apartment, which

10  appeared vacant.  (Tr. at 8.)  At the second apartment, the

11  detectives identified the occupants, who gave them permission to

12  search for stolen property.  (Tr. at 8.)

13      At approximately 2:50 p.m., detectives arrived at the third

14  location, 623 West Flora, number 19.  (Tr. at 8, 70.)  The

15  detectives knocked on the door several times, but no one

16  answered.  (Tr. at 9.)  Desimone and Nance started walking down

17  the stairs toward the parking lot; Lopez and Martinez were at the

18  top of the stairs.  (Tr. at 9.)

19      As Desimone was walking down the stairs, he saw defendant

20  pull into the parking lot in a purple Lexus, get out of the car

21  with a backpack, and walk up the stairs past him and Nance.  (Tr.

22  at 9.)  When defendant first came into contact with the

23  detectives, his eyes got big, and he appeared concerned.  (Tr. at

24  10.)  He continued walking up the stairs, but before reaching the

25  top, turned around and walked back to the car.  (Tr. at 10.)

26  Desimone noticed that defendant's car matched one of the vehicle

27  descriptions from the carjacking and that defendant was walking

28

1   in the direction of number 19.[2]  (Tr. at 10.)  Desimone asked

2   Chavez to stop so they could talk.  (Tr. at 10.)  Chavez ignored

3   him and got into the Lexus.  (Tr. at 11.)

4       At that point, Desimone walked behind the back of the Lexus,

5   which was nosed into a parking stall, to write down the license

6   plate number.  (Tr. at 11.)  Lopez and Martinez had come down the

7   stairs and were at the driver's window of the car.  (Tr. at 11.)

8   They did not intend to arrest him, nor did Lopez feel that he had

9   sufficient information to make an arrest.  (Tr. at 75.)  Rather,

10  Lopez merely sought to identify defendant.  (Tr. at 74.)

11      Chavez started the car, and the back-up lights came on.

12  (Tr. at 11.)  The car began edging back.  (Tr. at 75.)  Desimone

13  was about three feet behind the rear license plate, in the middle

14  of the car.  Lopez knocked on the door and told Chavez to stop.

15  Chavez replied, "Fuck you.  I ain't stopping."  Lopez again told

16  Chavez to stop, pulled the badge from his belt, and tapped the

17  driver's window with the badge.  Chavez continued to back toward

18  Desimone.  Lopez immediately pulled his duty gun, unholstered it,

19  and tapped the driver's window with the badge and the gun,

20  telling Chavez to stop.  (Tr. at 75.)  Chavez stopped the car,

21  put his hands in front of his body, and said, "Okay.  Okay.  I

22  didn't know who you were.  I did not know who you were."  (Tr. at

23  76.)  Lopez told Chavez to put the car in park, and Chavez

24  eventually complied.  (Tr. at 76.)

25  /////

26

27      [2]  Because the testimony reflects that defendant did not
    reach the top of the stairs and there were multiple apartments on
    the landing, it is unclear exactly which apartment Chavez was
28  heading toward.  (See Tr. at 105.)

1    Lopez reholstered his weapon, told Chavez he needed to speak

2   with him, and asked for his driver's license.  (Tr. at 76.)

3   Chavez began to reach in the backseat.  Lopez told Chavez, "Don't

4   reach for anything.  Put your hands in front of you.  Keep your

5   hands where I can see them."  (Tr. at 76.)  However, Chavez

6   continued to reach for a backpack in the backseat of the car and

7   brought it to the frontseat.  (Tr. at 77.)  Lopez was concerned

8   that Chavez was reaching for a weapon.  Both Lopez and Martinez

9   drew their weapons and pointed them at defendant.  (Tr. at 77.)

10  Lopez told Chavez to keep his hands away from the backpack and

11  where he could see them.  (Tr. at 78.)  Chavez responded, "Okay.

12  Okay.  Okay.  Okay.  Okay."  (Tr. at 78.)

13    Lopez then told Chavez to step out of the vehicle.  (Tr. at

14  78.)  Chavez again reached to the back of the car and grabbed a

15  black jacket from the backseat.  (Tr. at 78-79.)  Lopez again

16  drew his weapon.  (Tr. at 79.)  He told Chavez not to put the

17  jacket on, but Chavez did not comply.  (Tr. at 79, 114.)  At this

18  point, Lopez asserts that he sought only to get information and

19  to conduct a patdown search, based upon Chavez's failure to

20  comply and continuous reaching for items in the backseat of the

21  vehicle.  (Tr. at 79.)

22    Chavez exited the vehicle.  Lopez asked him to turn around

23  and put his hands behind his head.  (Tr. at 80.)  Chavez turned

24  around, but did not put his hands behind his head.  Lopez grabbed

25  defendant's jacket.  Chavez turned around and started running

26  northbound out of the apartment complex.  Lopez held onto the

27  jacket, but Chavez leaned forward and shed the jacket.  After

28  doing so, he turned and threw a roundhouse punch with his right

1 hand to Lopez's cheek.  (Tr. at 80-81.)  Lopez and Martinez
2 testified that prior to Chavez striking Lopez, there was no basis
3 for arrest.  (Tr. at 75, 82, 120.)

4     After striking Lopez, Chavez continued to run north, and
5 Lopez chased after him, grabbing defendant's t-shirt.  (Tr. at
6 81-82.)  Chavez shed his t-shirt.  (Tr. at 82.)  Lopez continued
7 to chase defendant, but fell.  (Tr. at 83.)  Both Desimone and
8 Martinez also gave chase.  (Tr. at 83.)  Chavez eventually ran
9 west and jumped over a fence.  Desimone followed defendant over
10 the fence, Lopez ran south, and Martinez returned to the vehicle.
11 (Tr. at 83-84, 115.)  Nance was on the radio in the street for
12 assistance.  (Tr. at 97, 116.)

13     Martinez testified that he was concerned that Chavez would
14 attempt to return to the vehicle.  (Tr. at 115.)  When Martinez
15 made it back to the vehicle, no one else was there, and the
16 defendant never returned.  (See Tr. at 115.)  Martinez removed
17 the backpack from the car and searched it.  He found a
18 semiautomatic Berretta handgun and $4000 in cash.  (Tr. at 116.)
19 Martinez relayed the information to Nance, who put it over the
20 radio.  (Tr. at 118.)  Martinez testified that he did not believe
21 he would find any evidence relating to Chavez's striking of Lopez
22 in the car; rather, Martinez believed that Chavez might be
23 connected to one of the robberies.  (Tr. at 121-22.)

24     Defendant Chavez was taken into custody approximately 20-25
25 minutes after Martinez found the gun.  (Tr. at 118.)  He was
26 charged with, *inter alia*, battery on a peace office in violation
27 of California Penal Code § 243(b), resisting, delaying or
28 obstructing a peace officer in the performance of his duty in

1 violation of California Penal Code § 148(a), and possession of a

2 concealed weapon within a car in violation of California Penal

3 Code § 12025(a)(1).  Approximately 30 minutes after finding the

4 gun, a tow was called for the car.  (Tr. at 118) ("We discovered

5 the gun at first and then requested the tow.  Within a half hour

6 after [discovering the gun].").

7      At the hearing, the parties stipulated to the following

8 timeline with respect to the relevant events that transpired on

9 December 11, 2008.  (Tr. at 39.)  At approximately 2:56 p.m.,

10 detectives reported that defendant Chavez was on the run.  (Tr.

11 at 37, 39.)  The car was searched *at some point prior* to 3:16

12 p.m.  (Tr. at 39.)  At approximately 3:16 p.m., there was a radio

13 call to tow defendant's vehicle.  (Tr. at 37, 39.)  At 3:18 p.m.,

14 it was reported that defendant was in custody.  (Tr. at 37, 39.)

15                          **ANALYSIS**

16      The Fourth Amendment guarantees the right of citizens "to be

17 secure in their persons, houses, papers, and effects, against

18 unreasonable searched and seizures."  U.S. Const. Amend. IV; see

19 United States v. Ruckes, -- F.3d --, 2009 WL 3719209, at *3 (9th

20 Cir. Nov. 9, 2009).  "Subject only to a few specifically

21 established and well-delineated exceptions, a search is presumed

22 to be unreasonable under the Fourth Amendment if it is not

23 supported by probable cause and conducted pursuant to a valid

24 search warrant."  Ruckes, 2009 WL 3719209, at *3 (internal

25 quotations and citations omitted).  "When the [g]overnment does

26 not meet the warrant requirement, it has the burden of proving

27 that the departure from this requirement was justified."  United

28 States v. Gardner, 627 F.2d 906, 909 (9th Cir. 1980).  If the

1  government cannot meet this burden, the "exclusionary rule"

2  prohibits evidence seized from an unlawful search from

3  constituting proof against the victim of the search.  <u>Wong Sun v.</u>

4  <u>United States</u>, 371 U.S. 471, 484 (1963).

5       Chavez moves to suppress all evidence seized from the car on

6  December 11, 2008 on the grounds that the car was searched and

7  the gun and money were seized without a warrant and that no

8  exception to the warrant requirement applies.

9  **A.    Search Incident to Arrest**

10      The government first contends that the search of the car

11  without a warrant was lawful as incident to Chavez's arrest for

12  striking detective Lopez.[3]

13      Searches incident to arrest are exempted from both the

14  warrant and probable cause requirements of the Fourth Amendment.

15  <u>United States v. Caseres</u>, 533 F.3d 1064, 1070 (9th Cir. 2008)

16  (noting that due to their inherent mobility, automobiles can

17

18       [3]    Defendant argues that the initial detention of Chavez,
    which he asserts occurred when detectives prevented him from

19  pulling out of the parking space and questioned him at gunpoint,
    was made without either reasonable suspicion or probable cause

20  and was therefore, unconstitutional.  However, defendant conceded
    that the subsequent crime committed, namely battery on a peace

21  officer, served as an independent basis for arrest.  (Tr. at
    142.)  Assuming *arguendo* that the initial detention was unlawful,

22  it does not insulate defendant's subsequent conduct or, standing
    alone, invalidate a search pursuant to that arrest.  <u>See</u> <u>Caseres</u>,

23  533 F.3d at 1069 (holding that although the initial detention, if
    successful, would likely have been unconstitutional, the

24  defendant's subsequent action in threatening the police officer
    was an independent basis for the subsequent arrest); <u>United</u>

25  <u>States v. Bailey</u>, 691 F.2d 1009, (11th Cir. (1983)
    ("[N]otwithstanding a strong causal connection between lawless

26  police conduct and a defendant's response, if the defendant's
    response is itself a new, distinct crime, then the police may

27  constitutionally arrest the defendant for that crime.").  Because
    the search was neither initiated nor effectuated until after

28  defendant struck Lopez, the lawfulness of the initial detention
    is irrelevant to the motion to suppress.

1  frequently be searched without a warrant if the search is

2  supported by probable cause) (citing <u>United States v. Robinson</u>,

3  414 U.S. 218, 235 (1973)).  Such searches are justified by the

4  need to (1) find weapons an arrestee might use; and/or (2) secure

5  evidence that he might conceal or destroy.  <u>Id.</u> (citing <u>Chimel v.</u>

6  <u>California</u>, 395 U.S. 752, 762-63 (1969)).  The permissible scope

7  of a search incident to a lawful arrest is "limited to the area

8  within the arrestee's immediate control."  <u>Id.</u>  When the arrestee

9  is a vehicle occupant, the vehicle's entire passenger compartment

10 is considered to be within the arrestee's immediate control.  <u>Id.</u>

11 (citing <u>New York v. Belton</u>, 453 U.S. 454, 460 (1981)).

12      The Supreme Court recently delineated a bright-line rule

13 regarding when an officer may search the passenger compartment of

14 a car pursuant to a lawful arrest.  <u>Arizona v. Gant</u>, 129 S. Ct.

15 1710, 1719 (2009).  "Officers are only permitted to search the

16 passenger compartment of an arrestee's automobile if the search

17 is required for officer safety or is necessary to prevent

18 destruction of evidence of the crime for which the recent

19 occupant was arrested."  <u>Ruckes</u>, 2009 WL 3719209, at *4 (citing

20 <u>Gant</u>, 129 S. Ct. at 1719); <u>see</u> <u>United States v. Gonzalez</u>, 578

21 F.3d 1130, 1132 (9th Cir. 2009) (noting that <u>Gant</u> applies

22 retroactively to all convictions not yet final at the time

23 decision was rendered and rejecting the government's argument

24 that the court should apply the good faith exception to the

25 exclusionary rule).  In <u>Gant</u>, the defendant was arrested for

26 driving on a suspended license.  129 S. Ct. at 1714.  Officers

27 placed him in handcuffs and secured him in the back of a patrol

28 car before conducting a search of the vehicle.  <u>Id.</u> at 1715.  The

1 search led to the discovery of cocaine in the pocket of a jacket

2 in the automobile's backseat.  Id.  The Supreme Court held that

3 the search was unconstitutional because (1) the defendant was not

4 in reaching distance of the car at the time of the search and

5 thus, there was no concern for officer safety; and (2) there was

6 no basis for officers to believe there was evidence relating to

7 the crime of driving on a suspended license that needed to be

8 preserved.  Id. at 1719; see Ruckes, 2009 WL 3719209, at *4

9 (holding that the search of a vehicle pursuant to the defendant's

10 arrest could not be upheld as a valid search incident to arrest

11 because the defendant was secured in the backseat of the patrol

12 car at the time of the search and there was no likelihood that

13 the officer might have discovered evidence of the defendant's

14 driving offense within the vehicle).

15     In this case, neither the officer safety nor the evidentiary

16 preservation justifications for a search incident to arrest

17 supports the search of Chavez's car.  At the time of the search,

18 defendant Chavez had fled from the car, eluded police offices,

19 and jumped over a fence.  He was nowhere near the car after he

20 fled the scene and jumped the fence.  As such, he was "clearly

21 beyond lunging distance" of the handgun in the backpack in the

22 front seat of the car at the time of the search.  See Ruckes,

23 2009 WL 3719209, at *4.  While Martinez asserted that he was

24 concerned that Chavez would return to the car to flee or recover

25 items from within, he also testified that once he returned to the

26 car, he ensured "by standing there" that Chavez would not be able

27 to gain access to the car.  (Tr. at 123.)  Therefore, even if

28 Chavez had returned to the vicinity of the car, he would not have

10

1  had access to the backpack or the gun as it was under Martinez's

2  "dominion and control."  (Tr. at 123.)

3       Moreover, akin to traffic-related offenses, it is generally

4  unlikely that an officer could reasonably expect to find evidence

5  of the crimes of battery upon an officer or resisting arrest

6  within a car.  See Gant, 129 S. Ct. at 1719 ("In many cases, as

7  when a recent occupant is arrested for a traffic violation, there

8  will be no reasonable basis to believe the vehicle contains

9  relevant evidence.").  Further, Martinez admitted that he did not

10 believe he would find any evidence relating to Chavez's striking

11 of Lopez in the car, the offense for which detectives had

12 probable cause to arrest Chavez.  (Tr. at 121-22.)  Accordingly,

13 under the circumstances presented in this case and particularly

14 in light of the testimony of the officer who searched the

15 vehicle, there was "no likelihood" that Martinez might have

16 discovered such evidence.  See Ruckes, 2009 WL 3719209, at *4.

17      Therefore, because neither justification for a search

18 incident to arrest existed in this case, the search of defendant

19 Chavez's car cannot be upheld on that theory in light of Gant.

20 **B.   Inventory Search**

21      Alternatively, the government contends that the evidence

22 seized from the car should not be suppressed because it

23 inevitably would have been discovered during an inventory search

24 of defendant's car after it was towed.[4]

25

26

27      [4]   The government first raised this argument in its
   supplemental brief filed after the evidentiary hearing.  The
   court allowed defendant to file a supplemental opposition and the
28 government to file a supplemental reply on this issue.

1    "The inevitable discovery doctrine is an exception to the

2    exclusionary rule."  Ruckes, 2009 WL 3719209, at *5 (quoting

3    United States v. Andrade, 784 F.2d 1431, 1433 (9th Cir. 1986)).

4    The doctrine permits the admission of unlawfully obtained

5    evidence against a defendant if that evidence "would have been

6    discovered absent a constitutional violation."  Id. (citing Nix

7    v. Williams, 467 U.S. 431, 443 (1984)).  "If the prosecution can

8    establish by a preponderance of the evidence that the information

9    ultimately or inevitably would have been discovered by lawful

10   means . . . , then the deterrence rationale [for the exclusionary

11   rule] has so little basis that the evidence should be received."

12   Nix, 467 U.S. at 444.

13       It is well-established that, as part of their "community

14   caretaking functions," law enforcement officers may take

15   automobiles into custody to permit the uninterrupted flow of

16   traffic, to enforce parking ordinances that promote public safety

17   and efficient movement of traffic, and, in some circumstances, to

18   preserve evidence.  South Dakota v. Opperman, 428 U.S. 364, 368-

19   69 (1976); see Colorado v. Bertine, 479 U.S. 367, 371 (1987)

20   ("The policies behind the warrant requirement are not implicated

21   in an inventory search, nor is the related concept of probable

22   caus.") (internal citation omitted).  "Whether an impoundment is

23   warranted under this community caretaking doctrine depends on the

24   location of the vehicle and the police officers' duty to prevent

25   it from creating a hazard to other drivers or being a target for

26   vandalism or theft."  Miranda v. City of Cornelius, 429 F.3d 858,

27   864 (9th Cir. 2005) (citing United States v. Jensen, 425 F.3d

28   698, 706 (9th Cir. 2005 ) ("Once the arrest was made, the

12

1  doctrine allowed law enforcement officers to seize and remove any

2  vehicle which may impede traffic, threaten public safety, or be

3  subject to vandalism."); Hallstrom v. City of Garden City, 991

4  F.2d 1473, 1477 n.4 (9th Cir. 1993)).  If officers are justified

5  in impounding a vehicle, a warrantless inventory search of the

6  vehicle pursuant to a standardized procedure is constitutionally

7  reasonable.  Opperman, 428 U.S. at 372-74; see also Cooper v.

8  California, 386 U.S. 58, 61-62 (1967) ("It would have been

9  unreasonable to hold that the police, having to retain the car in

10  their custody for such a length of time, had no right, even for

11  their own protection, to search it.").

12      Under California law, a car may be removed by a peace

13  officer "[w]hen an officer arrests a person driving or in control

14  of a vehicle for an alleged offense and the officer is . . .

15  required or permitted to take, and does take, the person into

16  custody."  Cal. Veh. Code § 22651 (West 2009).  However,

17  statutory authorization to remove a vehicle, by itself, does not

18  determine the constitutional reasonableness of the seizure.

19  Sibron v. New York, 392 U.S. 40, 61 (1968); People v. Williams,

20  145 Cal. App. 4th 756, 762 (2d Dist. 2006).  The government must

21  demonstrate that the removal of the vehicle furthered a

22  "caretaking function."  Miranda, 429 F.3d at 865; Williams, 145

23  Cal. App. 4th at 762.  The decision to impound a vehicle must

24  take into consideration whether the vehicle "was actually

25  impeding traffic or threatening public safety and convenience on

26  the streets, such that impoundment was warranted."  Id.  "An

27  officer cannot reasonably order an impoundment in situations

28  where the location of the vehicle does not create any need for

13

1   the police to protect the vehicle or to avoid a hazard to other

2   drivers."  Id.  (holding that the community caretaking function

3   was not implicated where the car was parked in the driveway of an

4   owner who had a valid license); see United States v. Squires, 456

5   F.2d 967, 970 (2d Cir. 1972) ("However, since the Cadillac was

6   parked in the parking lot behind the apartment house in which

7   appellant lived, which was an appropriate place for it to be, and

8   appellant did not consent to its removal, the officers did not

9   have a reasonable basis for concluding it was necessary to take

10  the Cadillac to the police station in order to protect it.");

11  Williams, 145 Cal. App. 4th at 762 (holding that impoundment was

12  constitutionally unreasonable pursuant to § 22651 where the car

13  was legally parked in front of the defendant's residence).

14      The Ninth Circuit recently analyzed the applicability of the

15  inevitable discovery doctrine based upon the inventory search of

16  an impounded vehicle to evidence that would otherwise be

17  suppressed under the rationale in Gant.  Ruckes, 2009 WL 3719209,

18  at *5-6.  In Ruckes, the defendant was stopped for speeding along

19  an interstate highway and arrested for driving on a suspended

20  license.  Id. at *5.  Pursuant to Washington statutory law, the

21  Washington State Patrol is expressly authorized to impound a

22  vehicle when the driver is arrested for driving with a suspended

23  license and may take custody of a car when it is left unattended

24  on a highway where it poses an obstruction to traffic or

25  jeopardizes public safety.  Id.  Further, the searching officer

26  presented evidence that it was standard procedure to impound a

27  car if no one was available to remove it from the side of a

28  highway.  Id.  Under these facts, the Ninth Circuit held that the

14

1  evidence seized during an unlawful search incident to arrest

2  would have inevitably been discovered during a good faith

3  inventory search following the lawful impoundment.  Id.  However,

4  the Ninth Circuit emphasized that "the inevitable discovery

5  doctrine will not always save a search that has been invalidated

6  under Gant"; rather, the government must demonstrate in each case

7  that there was "a lawful alternative justification for

8  discovering the evidence."  Id.

9       Under the facts before the court in this case, the

10  government has failed to demonstrate that impoundment of the car

11  pursuant to § 22651 was constitutionally reasonable.  At all

12  relevant times, Chavez's vehicle was parked in a parking space

13  adjacent to an apartment complex.  There is no evidence that

14  Chavez's vehicle was parked illegally or created a safety hazard

15  or impediment to traffic or other cars.  Further, there is no

16  evidence that defendant did not have a valid license, that the

17  car was not properly registered, or that the car had been

18  reported stolen; accordingly, the officers had no reason to

19  believe that Chavez was not in lawful possession of the car.  See

20  Williams, 145 Cal. App. 4th at 762.  Moreover, there is no

21  evidence that law enforcement would have impounded the car as a

22  matter of standard procedure pursuant to defendant's arrest for

23  striking Lopez.  Rather, the undisputed evidence demonstrates

24  that a tow was not requested until *after* Martinez searched the

25  car and found the gun and money.  Therefore, because the

26  government failed to present any evidence that a public safety

27  reason justified the search and because it similarly failed to

28  present any evidence that the impoundment was necessary to

15

1   prevent immediate and continued unlawful operation of the

2   vehicle, there is no showing that a community caretaking function

3   was served by impounding appellant's car.  As such, based upon

4   the record before the court, the impoundment of the car pursuant

5   to California Vehicle Code § 22651 was constitutionally

6   unreasonable.

7       The facts of this case are distinguishable from the facts in

8   Ruckes.  In Ruckes, subsequent to the defendant's arrest, if the

9   vehicle had not been impounded, it would have been left on the

10  side of an interstate highway; there was evidence that it was

11  standard state patrol procedure to tow a car under these

12  circumstances.  2009 WL 3719209, at *5-6.  Conversely, in this

13  case, if not impounded, the vehicle would have been left in a

14  parking space in an apartment parking lot.  Further, there is no

15  evidence that it was standard procedure for Stockton police to

16  tow a car under these circumstances.[5]  Accordingly, because the

17  location of the car in this case did not present the same

18  potential hazard to the vehicle or other drivers as the location

19  of the car in Ruckes, the inventory exception to the warrant

20  requirement does not apply and cannot support a finding of

21  inevitable discovery of the gun and money in Chavez's car.

22      Therefore, because the government failed to meet its burden

23  of establishing that the contents of the car would have been

24  eventually discovered by lawful means, the court cannot find that

25  /////

26

27      [5]   The court notes that even if the government offered
    such testimony, it would not necessarily render the impoundment
28  reasonable.

1  the doctrine of inevitable discovery would allow admission of the

2  contents of defendant's car.

3                          **CONCLUSION**

4      For the foregoing reasons, defendant's motion to suppress is

5  GRANTED.  The matter is set for a further status conference on

6  November 30, 2009 at 10:00 a.m.

7      IT IS SO ORDERED.

8  DATED: November 24, 2009.

9

10                     FRANK C. DAMRELL, JR.
                       UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17